UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------X

HENRI[ETTA] DONER-HEDRICK,

          Plaintiff,

    - against -

NEW YORK INSTITUTE OF
TECHNOLOGY,

          Defendant.
------------------------------------------------------X

**OPINION AND ORDER**

**11 Civ. 121 (SAS)**

```
USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: _6/12/12_
```

**SHIRA A. SCHEINDLIN, U.S.D.J.:**

       Henri[etta] Doner-Hedrick brings suit against the New York Institute of Technology ("NYIT") alleging, *inter alia*, discrimination and retaliation pursuant to Title VII of the Civil Rights Act of 1964[1] ("Title VII") and breach of contract pursuant to state common law. Defendant now moves for summary judgment dismissing plaintiff's discrimination, retaliation, and breach of contract claims under Rule 56(c) of the Federal Rules of Civil Procedure.[2] For the

---

[1]     42 U.S.C. § 2000e *et seq.*

[2]     The parties are in the process of negotiating a settlement of plaintiff's Third Claim, brought pursuant to the Internal Revenue Code (hereafter plaintiff's "independent contractor claim"). Because plaintiff's Third Claim was not briefed by either party, it is not part of the instant motion.

1

following reasons, defendant's motion is granted in part and denied in part.[3]

## I.   BACKGROUND[4]

Plaintiff is a non-Muslim Asian female, in her late fifties, whose ethnic heritage is Filipina.[5]  Beginning September 1, 2008, pursuant to a three-year employment Agreement,[6] plaintiff began teaching as an Assistant Professor in the Computer Graphics Department at NYIT's campus in Amman, Jordan.[7]   Infotec Corporation ("Infotec") is responsible for providing administrative support to NYIT's Amman campus including registrar, bursar, student affairs, security,

---

[3]     Plaintiff's First and Second claims, for discrimination and retaliation, are dismissed with prejudice while her Fourth Claim, for breach of contract, presents a disputed issue of material fact and is not dismissed. Plaintiff's Fourth Claim, will be the sole remaining claim once the parties settle plaintiff's Third Claim.

[4]     The following facts are taken from plaintiff's Amended Complaint ("Am. Cmpl."), Defendant's Rule 56.1 Statement ("Def. 56.1"), Plaintiff's Response to Defendant's Rule 56.1 Statement ("Pl. Resp."), and supporting documents.  Plaintiff neither admits nor denies the majority of defendant's separately numbered paragraphs.  Instead of providing her own separate, short and concise statement of additional material facts in dispute, plaintiff responds with answers containing voluminous, non-responsive supplemental information often followed by confusing citations.

[5]     See Am. Cmpl. ¶ 1.

[6]     See Ex. A to the 12/21/11 Affidavit of Neil G. Sparber, defendant's attorney ("Sparber Aff.").

[7]     See Am. Cmpl. ¶ 14; Def. 56.1 ¶¶ 1-2; Pl. Resp. ¶¶ 1-2.

library and other related support functions.[8]

When plaintiff arrived in Jordan, she was one of several faculty members working in the Computer Graphics Department along with: Dr. Jacqueline Taylor Basker (full-time), Feliz Soyak (full-time); Catherine Kourouklis (full-time); and Abdullah Ershaid (part-time, adjunct faculty member).[9]  At the time, Kourouklis was the Computer Graphics Coordinator responsible for the day-to-day supervision of the Department while Dean Roger Yu, dean of the School of Arts and Sciences, was ultimately responsible for the Department.[10]  Robert Michael Smith was the Global Coordinator for NYIT's Middle East campuses while Richard Chaney, who was later replaced by Dr. Omar Imady, was Dean of the Amman campus.[11]  Mohammed Odat, an Infotec employee, was the campus

---

[8]     *See* Def. 56.1 ¶¶ 3-4.  The scope of Infotec's decision-making authority is disputed by plaintiff who claims that "Infotech infringed on NYIT's authority in many ways," Pl. Resp. ¶ 3, and "exercise[d] undue influence on decisions that should have been NYIT's alone, such as the ultimate decision to terminate Plaintiff."  *Id.* ¶ 4.

[9]     *See* Def. 56.1 ¶ 5.  Later on, other faculty members joined the Department, including Pierre Pepin, Shadi Joudeh, and Rula Joudeh.  *See id.* ¶ 15.  During most of plaintiff's tenure at NYIT, there were four women and three men in the Department.  *See id.* ¶ 16.  The Department included individuals who were both Muslim and non-Muslim.  *See id.* ¶ 17.

[10]     *See id.* ¶ 6; Pl. Resp. ¶ 9.

[11]     *See* Def. 56.1 ¶¶ 8-9.

3

manager.[12]  Dr. Richard Pizer was NYIT's Provost and Vice President of

Academic Affairs[13] and Dr. Edward Guiliano was NYIT's President.[14]

Throughout her tenure at NYIT, plaintiff did not get along with

Catherine Kourouklis who mistreated everyone in the Computer Graphics

Department, with the exception of Soyak.[15]  Plaintiff testified that Kourouklis

treated her differently because she was older than Kourouklis which, according to

plaintiff, intimidated Kourouklis.[16]  Furthermore, Kourouklis allegedly disliked

plaintiff because she did not want to be friends with Kourouklis and because she

was friends with Dr. Taylor Basker, with whom Kourouklis did not get along.[17]

Plaintiff conceded that Kourouklis' disparate treatment of her was not due to the

fact that she is Filipina and non-Muslim.[18]

---

[12]    *See id.* ¶ 35.  Odat's title was Assistant to the Executive Chairman of
Infotec.  *See* 8/24/11 Deposition of Henrietta Doner-Hedrick ("Doner-Hedrick
Dep."), Ex. B to the Sparber Aff., at 69.  The Executive Chairman of Infotec was
Dr. Mohammed Hussein.  *See* Def. 56.1 ¶ 35.

[13]    *See* Def. 56.1 ¶ 32.

[14]    *See id.* ¶ 38.

[15]    *See id.* ¶¶ 11, 18.

[16]    *See id.* ¶ 14.

[17]    *See id.*

[18]    *See id.* (citing Doner-Hedrick Dep. at 102).

Kourouklis mistreated both her Muslim and non-Muslim colleagues alike but she only mistreated Ershaid  because of his religion, which was Muslim.[19] For instance, on April 5, 2009, plaintiff observed an incident where Kourouklis began yelling at Ershaid in front of her.[20]  Although plaintiff could not remember Kourouklis's exact words, she recalled that Kourkoulis insulted  Ershaid's religion.[21]  Plaintiff reported what she observed to Smith that same day.[22]  The next day, NYIT's New York administration was informed of the incident.  Three days later, on April 8, 2009, NYIT removed Kourouklis as the Coordinator of the Computer Graphics Department.[23]  Although Kourouklis was replaced by Dr. Taylor Basker as Coordinator, she remained as a full-time member of the faculty.[24]

Approximately eight months later, on November 22, 2009, plaintiff suggested to the students in her Senior Thesis I class that they design a pink

---

[19]   *See id.* ¶ 21.

[20]   *See id.* ¶ 52.

[21]   *See* Doner-Hedrick Dep. at 106 ("I do not remember the exact words because I was in shock.").

[22]   *See* Def. 56.1 ¶ 52.

[23]   *See id.* ¶ 54.

[24]   *See* Am. Cmpl. ¶ 71.

mosque, in the shape of a shoe, which would be for girls (or women) only.[25]  Two days later, on November 24, 2009, seven of the eight students from plaintiff's Senior Thesis I class signed a petition to NYIT complaining that plaintiff's statements were insulting to the religion of Islam (the "Petition").[26]  The Petition states as follows:

> On the behalf of the Senior Thesis I students, we would like to file a complaint against Professor Henry Donor Hedrick, for insulting the religion of Islam and violating the conduct of this university against the students.  As a professor, she is supposed to set an example for students, who are very influenced by her teachings, of being non biased towards one religion or another.  She has suggested that we as NYIT students should start a revolution and build a "**Pink Mosque shaped as a Shoe for girls only**" to improve the living conditions of Jordanians.  We as Muslim and Arab students find this to be very insulting and offensive, and we ask the administration of NYIT to take immediate action.[27]

Before making the offensive statements in issue, plaintiff had been warned not to talk politics or religion in class.[28]

---

[25]     *See* Def. 56.1 ¶ 23; Pl. Resp. ¶ 23.

[26]     *See* Def. 56.1 ¶ 24; Pl. Resp. ¶ 24.

[27]     Student Petition, Ex. E to the Sparber Aff. (emphasis in original).  In Muslim culture, the term shoe is considered to be derogatory and linking a shoe with a mosque is problematic and offensive.

[28]     *See* Doner-Hedrick Dep. at 147.

On November 24, 2009,  Ershaid e-mailed Dr. Imady, the campus

Dean, concerning a "serious issue that happened in the Computer Graphics

department."[29]  In that e-mail, Ershaid noted that his students appeared to be "very

upset" over plaintiff's suggestion that they "design a mosque in the shape of a shoe

and to color it pink for girls."[30]  The Ershaid E-mail goes on to state:

> I then went to Dr. Henri to confirm the story from her, for
> myself.  She did not deny anything, and she also felt no
> regret in saying it.  I also asked her how she would feel if
> I asked students to do the same but to a church.  She said
> that it would not bother her.  She also told me that I am
> more experienced and wise and that I should not be
> bothered by what she asked of the students.  And she told
> me to "let it go."  I went to her to hopefully hear an
> apology, but I left without one.[31]

Later that day, the Ershaid E-mail was forwarded to NYIT administrators,

including Dr. Pizer.[32]  That same day, Odat, the Amman campus manager, sent an

e-mail to Dr. Mohammed Hussein and Robert Vogt, both Infotec employees,

attaching the Petition and informing them of the incident (the "Odat E-mail").[33]

---

[29]     Def. 56.1 ¶ 28 (citing 11/24/09, 3:37 p.m. e-mail from  Ershaid to Dr.
Imady, Ex. F to the Sparber Aff. at NYIT00078 (the "Ershaid E-mail")).

[30]     Ershaid E-mail.

[31]     *Id.*

[32]     *See* Def. 56.1 ¶ 32.

[33]     *See id.* ¶ 35.

The Odat E-mail stated that the students were threatening to publish the story on Facebook and other media "in case the administration failed in taking any action with the professor [Doner-Hedrick]."[34]

Later that evening, a meeting was held at which plaintiff, Dr. Taylor Basker, Dean Imady and the Assistant Dean at the Amman campus, Dr. Ahmad Abdulhadi, discussed the Petition and plaintiff's statements regarding the incident, as conveyed by Ershaid.[35]  The next day, on November 25, 2009, Dr. Hussein sent an e-mail to Dr. Guiliano and Dr. Pizer which forwarded the Odat E-mail and urged Dr. Guiliano to take immediate action.[36]

Robert Savior, an administrator at NYIT, immediately began investigating the incident by reviewing various e-mails and conducting nine telephone interviews, on November 25 and 26, 2009, with the following persons: plaintiff, Dr. Taylor Basker, Dr. Imady, Odat, Dr. Abdulhadi, Kourouklis, Ershaid, Joudeh, and Hadi Kalani, Manager of Student Affairs.[37]  Savior, however, did not speak directly with any of the students who signed the Petition[38] but he did speak

---

[34]     Odat E-mail, Ex. H to the Sparber Aff. at NYIT00092.

[35]     *See* Def. 56.1 ¶ 33.

[36]     *See id.* ¶ 38.

[37]     *See id.* ¶¶ 39-40.

[38]     *See* Pl. Resp. ¶ 39.

8

with Dr. Taylor Basker, who had interviewed the students directly.[39]  During

Savior's interview, plaintiff admitted that she had, in fact, suggested to her students

that they design a pink mosque in the shape of a shoe.[40]  Both plaintiff and Dr.

Taylor Basker speculated to Savior that it must have been Odat and Kourouklis

who instigated the Petition because of the bad relations between plaintiff and

Odat/Kourouklis.[41]  Savior, however, could not corroborate plaintiff's conspiracy

theory.[42]

After Savior's investigation was complete, he drafted a memorandum

to Dr. Pizer, dated November 26, 2009 (the "Savior Memorandum"), in which he

made the following findings:

- Plaintiff acknowledged her suggestion of designing a pink, shoe-shaped mosque but stated that her remarks were not intended to disparage Islam;

- Plaintiff believes that her students' complaints were motivated by their lack of academic achievement;

---

[39]    *See id.* ¶ 40.

[40]    *See* Def. 56.1 ¶ 42.

[41]    *See id.* ¶ 43.

[42]    *See id.*

9

- Plaintiff believes that some other faculty members may have encouraged or assisted the students in preparing their Petition but there is no corroborating evidence to support this allegation;

- Plaintiff was initially defensive once the students' complaints were brought to her attention but eventually, although reluctantly, agreed that an apology may be warranted;

- Dr. Imady expressed significant doubt as to plaintiff's explanation for her remarks, disappointment over her lack of understanding of cultural sensitivity, and doubts as to whether she could regain the trust and respect of her colleagues and students; and

- with the exception of Dr. Taylor Basker, the other faculty members who were interviewed expressed serious concern over plaintiff's poor judgment, lack of cultural sensitivity, and reluctant contrition.[43]

In its Conclusion, the Savior Memorandum notes that Doner-Hedrick "displayed poor reasoning/judgment and was insensitive or oblivious to the impact that her comment could and did have."[44]  The Savior Memorandum concludes that because of plaintiff's response, her prior reputation and relationships, and the widespread dissemination of her actions, both within and outside the campus, it is unlikely

---

[43]    *Id.* ¶ 46.

[44]    Savior Memorandum, Ex. D to the Sparber Aff. at NYIT00002.

"that anything short of her removal from the Amman campus will suffice."[45]

The Savior Memorandum was sent to Dr. Pizer and other members of NYIT's senior administration.[46]  Dr. Pizer considered, *inter alia*, the Savior Memorandum, other e-mails he received, and the students' Petition in deciding whether to terminate plaintiff's employment contract.[47]  After conferring with Savior, Dr. Guiliano and Dean Yu, Dr. Pizer decided to terminate plaintiff's employment contract.[48]  On Monday, November 30, 2009, Dr. Pizer, together with Savior and Dean Yu, informed plaintiff that her employment contract had been terminated.[49]

## II.   PLAINTIFF'S ALLEGATIONS

Plaintiff alleges that the termination of her employment contract was based on her race, religion, national origin, color, and sex in violation of Title VII; that she was retaliated against in violation of Title VII; and that NYIT breached her employment contract when it terminated her.  Plaintiff claims she was repeatedly discriminated against while working for NYIT in Amman, Jordan.  At her

---

[45]   *Id.*

[46]   *See* Def. 56.1 ¶ 48.

[47]   *See id.* ¶ 49.

[48]   *See id.* ¶ 50.

[49]   *See id.* ¶ 51.

deposition, plaintiff testified as to the following instances of alleged

discrimination:

- shortly after plaintiff arrived on campus, she had difficulty with several male students who were dissatisfied with their grades and became angry. One male student cursed at plaintiff, kicked a chair, and slammed the door behind him. Another male student became angry and called plaintiff a "dictator." A third male student, who was given an "F" on a project, threatened plaintiff, telling her that he had ways of getting rid of her. Plaintiff reported these incidents to then-acting Dean Chaney. Plaintiff disagreed with the manner in which Dean Chaney disciplined these students, claiming that the administrators did not listen to her because she is a woman;[50]

- two male workers in the printing room would not allow plaintiff to have the requisite number of photocopies of handouts for her classes. Furthermore, on at least one occasion, Odat limited the number of copies plaintiff could have for a specific class. Plaintiff testified that she believed she was denied photocopies because of her sex. Plaintiff conceded, however, that Dr. Taylor Basker, Kourouklis and Soyak, all women, were provided with the requisite number of their copies;[51]

---

[50]    *See* Doner-Hedrick Dep. at 52-54.

[51]    *See id.* at 55-58.

12

- Ershaid wanted to overcharge plaintiff for teaching her a program called "3d Max" because she is a woman, Filipino, non-white and non-Muslim.   Plaintiff alleged that Ershaid liked Dr. Taylor Basker, Kourouklis and Soyak but disliked plaintiff because she is a woman, Filipino, non-white and non-Muslim.[52]

- plaintiff claims she was discriminated against when she attended a meeting some time after April 2009, where only Arabic was spoken. At one point during the meeting, Odat looked over at plaintiff angrily at which time two Arab women came over to plaintiff as if to escort her out.[53]

Furthermore, in an attempt to raise an inference of discrimination, plaintiff compares herself to two purportedly similarly situated male faculty members who also insulted Islam and, as a result, were removed from a foreign NYIT campus.[54]  Plaintiff argues that these two male faculty members were treated more favorably than her because they were not terminated.  Instead, these two faculty members were removed from campus and relieved of their duties and, unlike plaintiff, "both individuals continued to be paid and receive expenses, until

---

[52]     *See id.* at 58-62.

[53]     *See id.* at 71-73.

[54]     *See* Plaintiff's Memorandum of Law in Opposition to Defense Motion for Summary Judgment ("Pl. Opp.") at 16.

their contracts expired[.]"[55]  Plaintiff alleges that

> Infotech wanted her out, as it did the males, but in her case, because of her intrinsic characteristics, Odat insisted she be terminated and though a few initial emails allude to some severance, Plaintiff was not paid further and had to support her own transportation and moving expenses to and from Jordan.[56]

In addition to the above allegations of discrimination, plaintiff claims she was retaliated against for reporting the incident between Kourouklis and Ershaid in April 2009.  As stated earlier, on April 5, 2009, plaintiff witnessed an incident where Kourouklis abused and berated Ershaid, and insulted his religion, in front of her.  Plaintiff reported this incident to Smith and, consequently, Kourouklis was removed as Coordinator of the Computer Graphics Department.  NYIT terminated plaintiff's employment contract approximately eight months later, on November 30, 2009.  Plaintiff alleges that NYIT terminated her in retaliation for her reporting this incident.

Finally, plaintiff alleges that it was NYIT, not plaintiff, who breached the three-year employment contract between her and NYIT.  According to plaintiff, there was no just cause for the unilateral abrogation of her employment contract.[57]

---

[55]  *Id.*

[56]  *Id.* (citation omitted).

[57]  *See* Am. Cmpl. ¶ 210.

Plaintiff thus argues that her breach of contract claim should not be dismissed on summary judgment.

## III.    LEGAL STANDARDS

### A.    Summary Judgment

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."[58]  "A 'genuine issue' exists for summary judgment purposes where the evidence, viewed in the light most favorable to the nonmoving party, is such that a reasonable jury could decide in that party's favor."[59]  "A fact is 'material' for these purposes when it 'might affect the outcome of the suit under the governing law.'"[60]

In determining whether a genuine issue of material fact exists, the court must "constru[e] the evidence in the light most favorable to the non-moving party and draw all reasonable inferences" in that party's favor.[61]  However, "'only

---

[58]    Fed. R. Civ. P. 56(a).

[59]    *Guilbert v. Gardner*, 480 F.3d 140, 145 (2d Cir. 2007) (citing *Nabisco, Inc. v. Warner–Lambert Co.*, 220 F.3d 43, 45 (2d Cir. 2000)).

[60]    *Rojas v. Roman Catholic Diocese of Rochester*, 660 F.3d 98, 104 (2d Cir. 2011) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).

[61]    *Sledge v. Kooi*, 564 F.3d 105, 108 (2d Cir. 2009) (citing *Anderson*, 477 U.S. at 247-50, 255).

admissible evidence need be considered by the trial court in ruling on a motion for summary judgment.'"[62]  "'Credibility assessments, choices between conflicting versions of the events, and the weighing of evidence are matters for the jury, not for the court on a motion for summary judgment.'"[63]  "'The role of the court is not to resolve disputed issues of fact but to assess whether there are any factual issues to be tried.'"[64]  Summary judgment is therefore "appropriate only if there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law."[65]

In a summary judgment setting, "[t]he burden is on the moving party to demonstrate that no genuine issue respecting any material fact exists."[66]  "When the burden of proof at trial would fall on the nonmoving party, it ordinarily is sufficient for the movant to point to a lack of evidence . . . on an essential element

---

[62]     *Presbyterian Church of Sudan v. Talisman Energy, Inc.*, 582 F.3d 244, 264 (2d Cir. 2009) (quoting *Raskin v. Wyatt Co.*, 125 F.3d 55, 65 (2d Cir. 1997)).

[63]     *McClellan v. Smith*, 439 F.3d 137, 144 (2d Cir. 2006) (quoting *Fischl v. Armitage*, 128 F.3d 50, 55 (2d Cir. 1997)).  *Accord Anderson*, 477 U.S. at 249.

[64]     *Brod v. Omya, Inc.*, 653 F.3d 156, 164 (2d Cir. 2011) (quoting *Wilson v. Northwestern Mut. Ins. Co.*, 625 F.3d 54, 60 (2d Cir. 2010)).

[65]     *Pyke v. Cuomo*, 567 F.3d 74, 76 (2d Cir. 2009).

[66]     *Mavrommatis v. Carey Limousine Westchester, Inc.*, No. 10 Civ. 3404, 2011 WL 3903429, at *1 (2d Cir. Sept. 7, 2011) (citing *Gallo v. Prudential Residential Servs., L.P.*, 22 F.3d 1219, 1223 (2d Cir. 1994)).

of the nonmovant's claim."[67]   In turn, to defeat a motion for summary judgment, the non-moving party must raise a genuine issue of material fact.  The non-moving party "'must do more than simply show that there is some metaphysical doubt as to the material facts,'"[68] and cannot "'rely on conclusory allegations or unsubstantiated speculation.'"[69]

> "'It is now beyond cavil that summary judgment may be appropriate even in the fact-intensive context of discrimination cases.'"[70]  Summary judgment may be proper even in workplace discrimination cases, which tend to be very fact-intensive, because "'the salutary purposes of summary judgment—avoiding protracted, expensive and harassing trials—apply no less to discrimination cases than to other areas of litigation.'"[71]  However, greater caution must be exercised in granting summary judgment in employment discrimination cases where the employer's intent is genuinely at issue and circumstantial evidence may reveal an

---

[67]   *Cordiano v. Metacon Gun Club, Inc.*, 575 F.3d 199, 204 (2d Cir. 2009).

[68]   *Brown v. Eli Lilly & Co.*, 654 F.3d 347, 358 (2d Cir. 2011) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986)).

[69]   *Id.* (quoting *Federal Deposit Ins. Corp. v. Great Am. Ins. Co.*, 607 F.3d 288, 292 (2d Cir. 2010)).

[70]   *Feingold v. New York*, 366 F.3d 138, 149 (2d Cir. 2004) (quoting *Abdu-Brisson v. Delta Air Lines, Inc.*, 239 F.3d 456, 466 (2d Cir. 2001)).

[71]   *Meiri v. Dacon*, 759 F.2d 989, 998 (2d Cir. 1985).

inference of discrimination.[72]  This is so because "'[e]mployers are rarely so

cooperative as to include a notation in the personnel file that the firing is for a

reason expressly forbidden by law.'"[73]  Nonetheless, "[c]ourts within the Second

Circuit have not hesitated to grant defendants summary judgment in such cases

where . . . plaintiff has offered little or no evidence of discrimination."[74]

It is incumbent upon courts to "distinguish between evidence that

allows for a reasonable inference of discrimination and evidence that gives rise to

mere speculation and conjecture."[75]  "'[M]ere conclusory allegations, speculation

or conjecture will not avail a party resisting summary judgment.'"[76]  Thus, "even in

---

[72]     *See Schwapp v. Town of Avon*, 118 F.3d 106, 110 (2d Cir. 1997).

[73]     *Sadki v. SUNY Coll. at Brockport*, 310 F. Supp. 2d 506, 515
(W.D.N.Y. 2004) (quoting *Bickerstaff v. Vassar Coll.*, 196 F.3d 435, 448 (2d Cir.
1999) (internal quotation marks and citation omitted, brackets in original)).

[74]     *Alphonse v. State of Connecticut Dep't of Admin. Servs.*, No. 3:02 CV
1195, 2004 WL 904076, at *7 (D. Conn. Apr. 21, 2004) (quotation marks and
citation omitted).

[75]     *Bickerstaff*, 196 F.3d at 448.  *Accord Cameron v. Community Aid for
Retarded Children, Inc.*, 335 F.3d 60, 63 (2d Cir. 2003) ("'[P]urely conclusory
allegations of discrimination, absent any concrete particulars,' are insufficient" to
satisfy an employee's burden on a motion for summary judgment) (quoting *Meiri*,
759 F.2d at 998 (alteration in original)).  *Accord Jenkins v. New York State
Banking Dep't*, Nos. 07 Civ. 6322, 07 Civ. 11317, 2010 WL 2382417 (S.D.N.Y.
Sept. 30, 2010).

[76]     *Conroy v. New York State Dep't of Corr. Servs.*, 333 F.3d 88, 94 (2d
Cir. 2003) (quoting *Cifarelli v. Village of Babylon*, 93 F.3d 47, 51 (2d Cir. 1996)
(alteration in original)).

the discrimination context, a plaintiff must provide more than conclusory

allegations of discrimination to defeat a motion for summary judgment."[77]

### B.    Title VII

#### 1.    Discrimination

Title VII prohibits an employer from "discriminat[ing] against any

individual with respect to [her] compensation, terms, conditions, or privileges of

employment, because of such individual's race, color, religion, sex, or national

origin."[78]  "To withstand a motion for summary judgment, a discrimination

plaintiff must withstand the three-part burden-shifting laid out by *McDonnell

Douglas Corp. v. Green*."[79]  "[T]he initial burden rests with the plaintiff to

establish a prima facie case of discrimination."[80]  A plaintiff meets this burden by

showing that: (1) she falls within a protected group; (2) she was qualified for the

---

[77]    *Schwapp*, 118 F.3d at 110.

[78]    42 U.S.C. § 2000e-2(a)(1).

[79]    *McPherson v. New York City Dep't of Educ.*, 457 F.3d 211, 215 (2d Cir. 2006) (citing *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973)).  The *McDonnell Douglas* burden shifting analysis also applies to discrimination claims arising under the NYSHRL.  *See Tomka v. Seiler Corp.*, 66 F.3d 1295, 1308 n.4 (2d Cir. 1995); *Douglas v. District Council 37 Mun. Employees' Educ. Fund*, 207 F. Supp. 2d 282, 288 n.6 (S.D.N.Y. June 27, 2002).  Therefore, the Title VII analysis also applies to Parrilla's state discrimination claim.

[80]    *Cross v. New York City Transit Auth.*, 417 F.3d 241, 248 (2d Cir. 2005).

position she held; (3) she was subjected to an adverse employment action; and (4) the adverse employment action was taken under circumstances giving rise to an inference of unlawful discrimination.[81]  The Second Circuit has "characterized the evidence necessary to satisfy this initial burden as 'minimal' and 'de minimis.'"[82]

A plaintiff may raise an inference of discrimination by showing disparate treatment.  "A showing of disparate treatment – that is, a showing that the employer treated plaintiff 'less favorably than a similarly situated employee outside [her] protected group'– is a recognized method of raising an inference of discrimination for purposes of making out a prima facie case."[83]  A plaintiff must be similarly situated "in all material respects to the individuals with whom she seeks to compare herself."[84]  "Ordinarily, the question whether two employees are similarly situated is a question of fact for the jury."[85]  However, "a court can properly grant summary judgment where it is clear that no reasonable jury could

---

[81]     *See Terry v. Ashcroft*, 336 F.3d 128, 138 (2d Cir. 2003); *Byrnie v. Town of Cromwell Bd. of Educ.*, 243 F.3d 93, 101 (2d Cir. 2001).

[82]     *Zimmermann v. Associates First Capital Corp.*, 251 F.3d 376, 381 (2d Cir. 2001).  *Accord Woodman v. WWOR-TV, Inc.*, 411 F.3d 69 (2d Cir. 2005).

[83]     *Mandell v. County of Suffolk*, 316 F.3d 368, 379 (2d Cir. 2003) (quoting *Graham v. LIRR*, 230 F.3d 34, 39 (2d Cir. 2000)).

[84]     *Graham*, 230 F.3d at 39.

[85]     *Mandell*, 316 F.3d at 368.

find the similarly situated prong met."[86]

Once a plaintiff establishes a prima facie case, a rebuttable presumption of unlawful discrimination arises and the burden of production shifts to the employer to proffer a "legitimate, nondiscriminatory reason" for the challenged employment action.[87]  "If the defendant articulates such a reason, 'the presumption of discrimination drops out,' and the plaintiff must prove that the legitimate reasons offered by the defendant were not its true reasons, but were a pretext for discrimination."[88]  Pretext can be shown "either directly by persuading the court that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence."[89]

At this final stage of analysis, courts must "examin[e] the entire record to determine whether the plaintiff could satisfy [her] 'ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against

---

[86]     *Harlen Assocs. v. Incorporated Vill. of Mineola*, 273 F.3d 494, 499 n.2 (2d Cir. 2001).

[87]     *Woodman*, 411 F.3d at 76.

[88]     *Id.* (quoting *Roge v. NYP Holdings, Inc.*, 257 F.3d 164, 168 (2d Cir. 2001)).

[89]     *Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 256 (1981).

21

the plaintiff.'"[90]  In other words, the plaintiff is left with the final burden of proving that discriminatory animus "'was the real reason' for any adverse employment action."[91]  Direct evidence is not required; circumstantial evidence can suffice.[92]

## 2.     Retaliation

Under Title VII, it is unlawful for an employer to discriminate against an employee because she "has opposed any practice made an unlawful employment practice" by Title VII.[93]   The *McDonnell-Douglas* burden shifting analysis for discrimination cases applies to retaliation claims as well.[94]   To establish a prima facie case of retaliation, a plaintiff must show:

> [1] that [she] engaged in protected participation . . . under Title VII . . . , [2] that the employer was aware of this activity, [3] that the employer took adverse action against the plaintiff, and [4] that a causal connection exists between the protected activity and the adverse action, *i.e.*, that a retaliatory motive played a part in the adverse employment

---

[90]     *Schnabel v. Abramson*, 232 F.3d 83, 90 (2d Cir. 2000) (quoting *Reeves v. Sanderson Plumbing Prods.*, 530 U.S. 133, 143 (2000)).

[91]     *Cross*, 417 F.3d at 248 (quoting *Schnabel*, 232 F.3d at 87).

[92]     *See Norton v. Sam's Club*, 145 F.3d 114, 119 (2d Cir. 1998).

[93]     42 U.S.C. § 2000e-3(a).  *See also Kaytor v. Electric Boat Corp.*, 609 F.3d 537, 552 (2d Cir. 2010).

[94]     *See Slattery v. Swiss Reinsurance Am. Corp.*, 248 F.3d 87, 94 (2d Cir. 2001).

action.[95]

If the plaintiff sustains this initial burden, a presumption of retaliation arises and the burden then shifts to the employer to articulate a legitimate, non-retaliatory reason for the adverse employment action taken.[96]  If the employer meets this burden, the plaintiff must show that retaliation was a substantial reason for the adverse employment action.[97]

To constitute a "protected activity," a plaintiff must oppose statutorily prohibited discrimination.[98]  The law protects employees when they file a formal charge of discrimination with the EEOC, for example.  In addition, the law also protects informal complaints of discrimination made internally to supervisors, managers, and other human resources personnel.[99]

---

[95]    *Cifra v. General Elec. Co.*, 252 F.3d 205, 216 (2d Cir. 2001) (ellipses in original).

[96]    *See Hicks v. Baines*, 593 F.3d 159, 164 (2d Cir. 2010); *Slattery*, 248 F.3d at 94.

[97]    *See Hicks*, 593 F.3d at 164.

[98]    *See Galdieri-Ambrosini v. National Realty & Dev. Corp.*, 136 F.3d 276, 292 (2d Cir. 1998) (finding that plaintiff had failed to establish a *prima facie* case of retaliation where plaintiff's complaint did not allege that she was targeted because of her gender and nothing in her complaint could reasonably have led her employer to believe that she was complaining about gender discrimination).

[99]    *See Gregory v. Daly*, 243 F.3d 687 (2d Cir. 2001); *Matima v. Celli*, 228 F.3d 68, 78 (2d Cir. 2000).

23

An adverse employment action in the context of a retaliation claim is an action sufficiently severe to dissuade a reasonable worker from making or supporting a complaint or charge of discrimination.[100]   "[A]nti-discrimination and anti-retaliation provisions 'are not coterminous;' anti-retaliation protection is broader and 'extends beyond workplace-related or employment-related retaliatory acts and harm.'"[101]   "An employee's decision to report discriminatory behavior cannot immunize that employee from those petty slights or minor annoyances" that happen in the workplace, because "[t]he anti-retaliation provision protects an individual not from all retaliation, but from retaliation that produces an injury or harm."[102]

The proof required to establish a causal connection between the protected activity and the alleged adverse employment action can be shown either:

> (1) indirectly, by showing that the protected activity was followed closely by discriminatory treatment, or through other circumstantial evidence such as disparate treatment of fellow employees who engaged in similar conduct; or (2) directly, through evidence of retaliatory animus directed

---

[100]   *See White*, 548 U.S. at 68.

[101]   *Hicks*, 593 F.3d at 165 (quoting *White,* 548 U.S. at 67).

[102]   *White*, 548 U.S. at 67-68.

against the plaintiff by the defendant.[103]

Even "[t]he cases that accept mere temporal proximity between an employer's knowledge of protected activity and an adverse employment action as sufficient evidence of causality to establish a prima facie case uniformly hold that the temporal proximity must be very close."[104]  Courts in this Circuit have held that periods "of two months or more defeat an inference of causation."[105]

## C.    Breach of Contract

"Under New York law, when one party has committed a material breach of a contract, the non-breaching party is discharged from performing any

---

[103]    *Gordon v. New York City Bd. of Educ.*, 232 F.3d 111, 117 (2d Cir. 2000).

[104]    *Clark County Sch. Dist. v. Breeden*, 532 U.S. 268, 273 (2001) (per curiam) (internal quotation marks omitted).

[105]    *Ragin v. East Ramapo Cent. Sch. Dist.*, No. 05 Civ. 6496, 2010 WL 1326779, at *24 (S.D.N.Y. Mar. 31, 2010).  *Accord Hollander v. American Cyanamid Co.*, 895 F.2d 80, 85 (2d Cir. 1990) (three month lapse between protected activity and adverse act was insufficient to establish a causal connection); *Garrett v. Garden City Hotel, Inc.*, No. 05 Civ. 962, 2007 WL 1174891, at *21 (E.D.N.Y. Apr. 19, 2007) (same for two-and-a-half month lapse); *Yarde v. Good Samaritan Hosp.*, 360 F. Supp. 2d 552, 562 (S.D.N.Y. 2005) ("Three months is on the outer edge of what courts in this circuit recognize as sufficiently proximate to admit of an inference of causation"); *Wayne v. Principi*, No. 01 Civ. 941, 2004 WL 389009, at *13 (S.D.N.Y. Mar. 3, 2004) (three month period between protected activity and adverse act was insufficient to establish a causal connection); *Carr v. WestLB Admin., Inc.*, 171 F. Supp. 2d 302, 309-10 (S.D.N.Y. 2001) (same for four month lapse).

further obligations under the contract, and the non-breaching party may elect to terminate the contract and sue for damages."[106]  With regard to materiality, this Court has stated:

> Materiality goes to the essence of the contract. That is, a breach is material if it defeats the object of the parties in making the contract and deprive[s] the injured party of the benefit that it justifiably expected.  Materiality does not depend upon the amount of provable money damages, it depends upon whether the nonbreaching party lost the benefit of its bargain.[107]

## IV.   DISCUSSION

### A.   Discrimination

#### 1.   Plaintiff Cannot Establish a Prima Facie of Discrimination

Plaintiff's speculative and conclusory allegations of discrimination are inadequate to establish a prima facie case of discrimination.  Accordingly, plaintiff's discrimination claim, based on her being a non-Muslim, Filipina, brown-skinned woman, must be dismissed because she has failed to present any evidence that any adverse actions were taken against her based on a protected characteristic. Plaintiff cannot raise an inference of discrimination merely by presenting evidence

---

[106]   *NAS Elecs., Inc. v. Transtech Elecs. PTE Ltd.*, 262 F. Supp. 2d 134, 145 (S.D.N.Y. 2003).

[107]   *ESPN, Inc. v. Office of the Comm'r of Baseball*, 76 F. Supp. 2d 416, 421 (S.D.N.Y. 1999) (quotation marks and citation omitted, alteration in original).

that she was disliked or treated badly.  Rather, plaintiff must demonstrate that the alleged discriminatory treatment she suffered was based on a protected characteristic, *i.e.*, that the action taken was motivated by discriminatory animus. This she has not done.

Plaintiff recounts four instances of purported discrimination which occurred prior to her allegedly unlawful termination, none of which support an inference of discrimination.[108] *First*, mere disagreement with the discipline imposed on several angry male students by Dean Chaney does not prove that plaintiff was treated differently because of her sex. *Second*, plaintiff's speculation that she was denied photocopies because of her sex is belied by her admission that three other women, Dr. Taylor Basker, Kourouklis, and Soyak, were provided the requisite number of photocopies they requested.  *Third*, there is no evidentiary support on which to conclude that Ershaid wanted to overcharge plaintiff for "3d Max" computer tutorials because she is a woman, Filipina, non-white and non-Muslim.  *Finally*, plaintiff's allegations regarding the April 2009 meeting are insufficient to demonstrate discriminatory animus on the part of NYIT as plaintiff does not even know what was said at that meeting.  In sum, the four instances of purported, pre-termination discrimination do not remotely support an inference of

---

[108]     *See supra* Part II.

discrimination, are without evidentiary support,  and, in any event, involve students, co-workers, and non-NYIT personnel whose acts cannot be imputed to NYIT.

Plaintiff's allegations of mistreatment by students, Infotec employees, and co-workers, including Kourouklis, also fail to raise an inference of discrimination.  Even if plaintiff were disliked by Kourouklis and others, she has provided no evidence that any actions were directed at her because she is a non-Muslim, Filipina, brown-skinned woman.  In short, plaintiff has failed to present any evidence that any of the alleged mistreatment she endured was the result of discriminatory animus.

Furthermore, NYIT's termination of her employment contract, and the circumstances surrounding that decision, do not give rise to an inference of discrimination.  Plaintiff admitted that she suggested to her students that they design a pink mosque, in the shape of a shoe, for women only.  This suggestion offended some of her students, seven of whom signed the Petition calling for NYIT to take action.  Once NYIT's New York administrators learned of the incident, a thorough investigation was conducted.  After the investigation was completed, Dr. Pizer decided that plaintiff's admitted misconduct warranted the termination of her employment contract.  There is absolutely no evidence that the person who

28

conducted the investigation, or anyone else involved in the decision to terminate

plaintiff's employment, was motivated by any discriminatory animus.

### 2.    Plaintiff Is Not Similarly Situated to the Two Faculty Members to Whom She Makes Reference

Plaintiff attempts to raise an inference of discrimination by identifying

two similarly situated male faculty members who also allegedly insulted Islam but

were purportedly treated more favorably than plaintiff.[109]  Although plaintiff does

not identify these comparators by name, it is apparent that she is referring to

former faculty members Dennis Balk and Daniel Freeman, both white, non-Muslim

males who taught at NYIT's campus in Bahrain.  According to plaintiff,

> Infotech had used a similar approach, i.e. fabricating an "incident," to remove faculty on two prior occasions on campuses it operated with NYIT.  In both cases, there were the allegations of "insults to Islam," invented threats of danger to the faculty member, the scurrilous need to remove the Professor from the scene immediately for their "safety" as their life was in grave danger, and there was potential or actual Facebook postings that never occurred.[110]

Plaintiff alleges that Balk and Freeman were not terminated but were only removed

from campus and relieved of their duties and that, unlike plaintiff, they continued

---

[109]    *See* Pl. Opp. at 16.

[110]    Def. Mem. at 16 (citations omitted).

to be paid and receive expenses.[111]

Freeman and Balk are not appropriate comparators given the remaining time on their employment contracts at the time of their separation from NYIT. Freeman had a one-year employment contract with NYIT for the period September 1, 2005 though August 31, 2006.[112] Freeman stopped teaching for NYIT on April 30, 2006, at which time NYIT paid him $21,666.68 for the "execution of a separation agreement."[113] Balk's employment contract expired on May 31, 2008, but he stopped teaching for NYIT in March of 2008.[114] According to NYIT's records, "NYIT paid Balk approximately $21,500 for the three month period between the time plaintiff ceased performing services for NYIT and the expiration of Balk's contract."[115]

---

[111]   *See id.* ("In each prior case, however, the individual was male, and no termination took place, only a removal, or a demand for removal, from campus.  In the two prior cases, unlike Plaintiff's, both individuals continued to be paid and received expenses, until their contracts expired, but were just relieved of their duties, and banned from campus.").

[112]   *See* 2/10/12 Affidavit of Carol Jablonsky, NYIT's Director of Human Resources, ¶ 3.

[113]   *Id.*

[114]   *See id.* ¶ 4.

[115]   *Id.* It is uncertain whether this payment was in exchange for a settlement agreement and release of claims or whether it was simply a buyout of Balk's remaining contract.

Accordingly, Freeman had four months left on his employment contract, while Balk had three months left, when they received their "severance" payments from NYIT.[116]  Thus, by relieving them of their duties and banning them from the Bahrain campus, it is unknown whether NYIT terminated Freeman and Balk in the traditional sense, or merely bought out their remaining contracts for reasons unknown.  Because NYIT may have made a business decision to buy Freeman and Balk out of their employment contracts, they are not appropriate comparators to plaintiff.

In addition, plaintiff has failed to show that she is similarly situated in all material respects to Freeman and Balk.  For example, plaintiff does not specify how Freeman and Balk allegedly insulted Islam.  Furthermore, it is not known what courses Freeman and Balk taught and whether they could still teach at other NYIT campuses.  Also not known is their qualifications, their interaction with other NYIT personnel, and whether they received moving expenses from NYIT in moving to and from Bahrain.[117]  In fact, all that is know about Freeman and Balk is that they taught for NYIT at its Bahrain campus but no longer do.  Given these

---

[116]    At the time of her termination, plaintiff had approximately twenty-one months left on her thirty-six month employment contract.

[117]    In this regard, plaintiff claims that she "was not paid further and had to support her own transportation and moving expenses to and from Amman."  Pl. Opp. at 16.

glaring omissions, plaintiff's comparison of herself to Freeman and Balk in an attempt to raise an inference of discrimination is to no avail.

### 3.      NYIT's Legitimate, Non-Discriminatory Reason

Assuming, *arguendo*, that plaintiff could establish a prima facie case of discrimination, her discrimination claim would nonetheless fail because she has not presented any evidence that NYIT terminated her contract because of her race, color, religion, gender and/or national origin.  Rather, NYIT based its decision on a good-faith business determination that plaintiff engaged in misconduct warranting her termination.  In offering a legitimate, business justification for its decision to terminate plaintiff, NYIT must present specific non-discriminatory reasons for its actions.[118]  Here, NYIT maintains that it terminated plaintiff's employment because of the suggestion that her students design a pink, shoe-shaped, women only mosque and her students' response thereto.  Plaintiff's students found her suggestion for such a design to be offensive and seven of them signed the Petition seeking her removal.  Whether plaintiff's design suggestion was, in fact, offensive to Islam is not relevant.  What is relevant is NYIT's good-faith belief that plaintiff's statement was offensive and that its students were offended.

---

[118]      *See Bernard v. J.P. Morgan Chase Bank, N.A.*, No. 08 Civ. 4784, 2010 WL 423102, at *6 (S.D.N.Y. Feb. 5, 2010).

After NYIT became aware of the allegations against plaintiff, it conducted a thorough investigation which included nine interviews.  Savior and Dr. Pizer were aware of plaintiff's conspiracy theory that the students' Petition was orchestrated by Kourouklis and Odat, both of whom wanted her terminated.  But based on the information obtained from the interviews, the credibility of the witnesses, a review of the students' Petition, and the emails which followed the incident, NYIT determined that plaintiff engaged in misconduct justifying the termination of her employment contract.  Because NYIT had a legitimate business reason for its decision to terminate plaintiff's employment contract, the burden shifts back to the plaintiff to show that the proffered reason is a pretext and that the real reason for her termination is unlawful discrimination.

### 4.    Plaintiff Has Offered No Evidence of Pretext

Plaintiff alleges that NYIT's stated reasons for her termination – her admission that she made the statements at issue, her failure to offer an apology, and the ensuing "uproar on campus" – were a pretext for intentional discrimination. The problem is that plaintiff has offered no evidentiary support for a finding of pretext and her arguments are without merit.

Plaintiff's own theory of the reason for her termination refutes any discriminatory motive.  At her deposition, plaintiff testified that she was terminated

because of an alleged conspiracy among: (1) the students, who did not like her because of her disciplined approach to teaching and grading; (2) Infotec employees Odat and Dr. Hussein, who did not like her and wanted to placate the students; and (3) Kourouklis, who aided the conspiracy because she did not like plaintiff.[119] Plaintiff speculates that the offensive statements she made regarding a pink, shoe-shaped mosque were used by her students, Odat, Dr. Hussein and others in a plot to exert pressure on NYIT to terminate her contract. Even if plaintiff's version of the facts were true, the alleged pressure exerted on NYIT would be a legitimate, non-discriminatory reason for her discharge. In other words, plaintiff's theory that NYIT bowed to the pressure in order to placate students and keep enrollment up has nothing to do with discriminatory animus. Thus, plaintiff has presented no evidence that the alleged conspiracy was motivated by discriminatory animus.[120]

---

[119]   *See* Doner-Hedrick Dep. at 173-177, 217-221.

[120]   *See Baur v. Rosenberg, Minc, Falkoff & Wolff*, No. 07 Civ. 8835, 2008 WL 5110976, at *5 (S.D.N.Y. Dec. 2, 2008) ("[Plaintiff's] second argument – that her firing was the culmination of a plot or "schematic design" to force her to quit or justify her termination – is without merit. Even if [plaintiff] had introduced admissible evidence that her colleagues and the building's management were engaged in a conspiracy to terminate her employment – which she has not – she has not adduced even a scintilla of evidence that the rationale for that conspiracy was age discrimination. It is not enough that defendant's asserted rationale be a pretext. Rather it must be a pretext for age discrimination.").

In sum, with no evidence that any decision-maker at NYIT, or any of the alleged conspirators, acted against plaintiff based on a protected characteristic, plaintiff has failed to demonstrate that NYIT's stated reasons for her termination were a pretext for intentional discrimination. Thus, plaintiff cannot overcome NYIT's legitimate non-discriminatory reason for the termination of her contract. Plaintiff's discrimination claim is therefore dismissed.

**B.     Retaliation**

Assuming plaintiff's report of the alleged incident where Kourouklis berated Ershaid and insulted his religion is a protected activity, there is simply no evidence that any adverse action was taken against her because of that report. There is no direct evidence that NYIT retaliated against plaintiff for reporting the Kourouklis/Ershaid incident. Plaintiff reported the incident on April 6, 2009. There is no evidence that NYIT took any action against plaintiff as a result of that report. Moreover, plaintiff has failed to offer any proof that her termination on November 30, 2009, approximately eight months later, was the result of her reporting the incident.

There is also no indirect evidence of retaliation. With regard to causation, unless the temporal proximity is very close, no causal inference arises. In general, periods greater than two months defeat an inference of causation. Here,

the period between the reporting of the incident on April 6, 2009, and the adverse

employment action on November 30, 2009, is nearly eight months.  It is simply not

credible to conclude that NYIT waited patiently for this long, hoping that plaintiff

would make a mistake that would justify her retaliatory discharge.  In any event,

NYIT's legitimate, non-discriminatory reason for plaintiff's termination also

serves as NYIT's legitimate, non-retaliatory reason for plaintiff's termination.  For

the same reasons that plaintiff's discrimination claim fails as a matter of law, so

too does her retaliation claim.  Because plaintiff has not overcome NYIT's

legitimate, non-retaliatory reason for her termination, plaintiff's retaliation claim is

dismissed.

### C.    Breach of Contract

NYIT argues that plaintiff's breach of contract claim should be

dismissed on summary judgment because plaintiff's misconduct in suggesting the

design of a pink, shoe-shaped mosque constituted a material breach.  According to

NYIT,

> [p]laintiff's offensive and insulting statements to students
> not only made it impossible for her to continue to teach for
> NYIT, the object of the contract between plaintiff and
> NYIT, but plaintiff's offensive statements, and the resulting
> uproar, damaged NYIT's reputation in the region.  As a
> result, plaintiff's misconduct constituted a material breach
> of her contract with NYIT.  NYIT was relieved of any
> obligations under the contract and, as a result, did not

36

breach the contract as a matter of law.[121]

Whether plaintiff's design suggestion prevented her from continuing to teach presents a disputed issue of material fact. Perhaps NYIT could have taken steps short of terminating her employment contract that would have allowed plaintiff to continue teaching. If so, plaintiff's misconduct would not be a material breach of her employment contract. Determining which party breached the employment contract presents a fact question best left for a jury to resolve. Because the legitimacy of NYIT's response to plaintiff's misconduct is in dispute, plaintiff's breach of contract claim cannot be dismissed on summary judgment.

### D.    Miscellaneous Issues

#### 1.    Plaintiff Was Not Terminated to Protect her from a Religious Hate Crime

In her opposition memorandum, plaintiff argues that she was terminated in order to protect her from a religious hate crime.[122] According to plaintiff, both Dr. Imady and Dr. Pizer admitted that concern for plaintiff's safety and well-being was a factor in her dismissal. Plaintiff states that Dr. Imady told Dr. Taylor Basker that plaintiff will not be returning to campus because of safety

---

[121]    Def. Mem. at 25.

[122]    *See* Pl. Opp. at 19 ("To fire a Plaintiff because she is a potential victim of a religious hate crime, is to doubly discriminate against Plaintiff.").

issues.[123]   Assuming this to be true, any mention by Dr. Imady that plaintiff's safety was a reason for her termination is irrelevant as Dr. Imady was not involved in the decision to terminate plaintiff's contract.   Moreover, plaintiff misrepresents Dr. Pizer's testimony when she states:  "Even Pizer admits that Plaintiff being in danger of falling victim to a religious hate crime was a factor in Plaintiff's dismissal."[124]   In fact, Dr. Pizer testified that although "[i]ssues of safety had been raised" in some e-mails, he "did not address the dismissal in terms of the safety issue."[125]   Thus, there is no indication that any of the relevant decision-makers took plaintiff's safety into account in deciding to terminate her employment contract.

### 2.   NYIT Is Not Liable for the Alleged Discriminatory Acts of Infotec Employees

Plaintiff argues that employees of Infotec discriminated against her based on her protected characteristics and that NYIT is liable for Infotec's alleged

---

[123]   *See id.* (citing 12/2/09 e-mail from Dr. Taylor Basker to Robert Smith, Ex. 3 to the 2/2/12 Declaration of Joy Hochstadt, plaintiff's attorney ("Hochstadt Decl."), at NYIT00214) ("Jacqui was called into Omar Imady's office and told Henri was being removed from NYIT for her own safety[.]").

[124]   Pl. Opp. at 19.

[125]   Deposition Transcript of Dr. Pizer, Ex. 8 to the Hochstadt Decl., at 215.

discriminatory acts against her.[126]  For the reasons stated above, this Court has found that there is no evidence of discrimination.  Without a basis for imposing liability, NYIT cannot be held liable for the acts of Infotec employees.  In any event, NYIT lacked the requisite knowledge and control over Infotec to be held liable for the acts of its employees.  NYIT and Infotec were parties to an arm's length contract under which Infotec provided certain services to NYIT.  Accordingly, NYIT had no control over Infotec employees and plaintiff's attempt to hold NYIT liable for the acts of Infotec is rejected.

## V.    CONCLUSION

For the foregoing reasons, defendant's motion for summary judgment is granted in part and denied in part.  Plaintiff's First and Second Claims are dismissed while her Fourth Claim survives.  The Clerk of the Court is directed to close this motion [Docket Entry # 35].  A status conference has been scheduled for Thursday, June 21, 2012, at 4:30 p.m. in Courtroom 15C.

---

[126]    *See* Pl. Opp. at 22 ("In an amalgam relationship such as that of NYIT and Infotech [sic], NYIT has a duty to protect its faculty from being discriminated against by the entity under whose control it places its employees.").

SO ORDERED:

Shira A. Scheindlin
U.S.D.J.

Dated:      New York, New York
            June 12, 2012

40

## Appearances

**For Plaintiff:**

Joy Hochstadt, Esq.
Joy Hochstadt, P.C.
300 Central Park West
New York, NY 10024
(212) 580-9930

**For Defendant:**

Douglas P. Catalano, Esq.
Neil G. Sparber, Esq.
Fulbright & Jaworski, LLP
666 Fifth Avenue
New York, NY 10103
(212) 318-3000